UNITED STATES of America,

v.

Mark SHKOLIR, and Eric Vainer, a/k/a "Eric Cohen", Defendants.

No. 98 CR. 0001(PKL).

United States District Court, S.D. New York.

Aug. 24, 1998.

---

Mary Jo White, U.S. Atty., for the Southern District of New York, New York, NY, for U.S.; Daniel M. Gitner, of counsel.

Samuel W. Seymour, John C.L. Dixon, New York, NY, for Mark Shkolir.

Edward S. Panzer, New York, NY, for Eric Vainer.

## OPINION AND ORDER

LEISURE, District Judge.

On May 21, 1998, following a two-and-one-half-week jury trial, defendants Mark Shkolir and Eric Vainer, a/k/a "Eric Cohen", each were convicted of one count of conspiracy to commit securities fraud, mail fraud, and wire fraud, in violation of 18 U.S.C. § 371. Both defendants now move for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, or in the alternative for a new trial pursuant to Fed.R.Crim.P. 33. For the reasons stated in this Opinion, the motions are denied.

## BACKGROUND

Defendants' convictions relate to their participation in a conspiracy to sell stock in Millennium Software Solutions, Inc. ("Millennium"). In unsolicited telephone calls and in a purported private placement offering memorandum, potential investors were informed that Millennium was a computer company developing a solution to the "millennium bug" or "Year 2000 problem" that has gained much notoriety in the recent past. Potential investors also were led to believe that Charles Schwab & Co. ("Schwab"), a large brokerage firm, was involved in the private placement. See Trial Transcript (hereinafter, "Tr.") 36–39, 68, 340–43, 494–95; see also Government Exhibit ("GX") 1. During the trial, the Government produced evidence tending to show that Millennium was a shell company with no on-going business and no promise of future activity. For instance, the address designated as Millennium's Wall Street headquarters was a mail drop and its main phone number was connected to a business answering service. See Tr. 206, 219. Despite efforts to do so, the Government was unable to uncover any evidence that Millennium engaged in any business operations beyond raising funds. See Tr. 749–51. Influenced by misrepresentations by the cold-callers and in the offering memorandum, over forty people attempted to invest a total of approximately $360,000 in Millennium in the last months of 1997.

Shkolir and Vainer undertook certain activities on Millennium's behalf. On or about November 1, 1997, they executed the paper-work needed to obtain for Millennium a mailing address at Mail Boxes Etc., with Shkolir signing a contract that identified Millennium as a computer consulting company. See Tr. 179–93; see also GX 640. Defendants later procured a Wall Street mailing address for Millennium by executing an agreement with Service Resource Industries, Inc. ("SRI"), another company that provides mail and phone services to businesses. Shkolir and Vainer completed and signed a rental form in connection with this transaction, remitting $207.84 to open the account. See Tr. 208–216; see also GX 620, 622.

On November 12, 1997, Shkolir opened an account in Millennium's name at Republic National Bank in New York. See Tr. 559–64; see also GX 550. Shkolir subsequently attempted to deposit additional funds into the Republic account. See Tr. 930–31; see also GX 427. One day after opening the account at Republic, Vainer and Shkolir used a starter check from that account to open an account in Millennium's name at the World Trade Center branch of Schwab. See Tr. 239–42; see also GX 104. Vainer attempted to deposit checks from investors into Millennium's Schwab account and sought to obtain information about withdrawing funds from the account. See Tr. 247–51; see also GX 101, 102. Vainer and Shkolir later visited the Schwab branch at the World Trade Center together and met with a Schwab employee in order to inquire about the status of funds deposited into Millennium's account. See Tr. 609–11.

On December 5, 1997, defendants returned to Schwab to inquire again about the status of Millennium's account. While defendants believed they were conversing with a Schwab compliance officer, they actually met with Special Agent Bill McGrogan of the Federal Bureau of Investigation ("FBI"), acting in an undercover capacity. See Tr. 757–62. This meeting was recorded. Finally, defendants returned to Schwab's World Trade Center branch on December 8, 1997, at which time they were arrested. See Tr. 802–05. Defendants subsequently were indicted and convicted on one count each of criminal conspiracy.

## DISCUSSION

### I. Applicable Legal Standards

#### A. *Rule 29*

 Both defendants move for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. When a defendant moves pursuant to Rule 29, the district court must determine, based on all of the relevant evidence, whether a rational juror "might fairly conclude guilt beyond a reasonable doubt." *United States v. Mariani,* 725 F.2d 862, 865 (2d Cir.1984) (quoting *United States v. Taylor,* 464 F.2d 240, 243 (2d Cir.1972)). The district court must draw all reasonable inferences in the favor of the Government, *see Mariani,* 725 F.2d at 865, and must resolve all issues of credibility in favor of the jury's verdict. *See, e.g., United States v. Weiss,* 930 F.2d 185, 191 (2d Cir. 1991); *United States v. Roldan–Zapata,* 916 F.2d 795, 802 (2d Cir.1990). To succeed on the motion, a defendant must persuade the court that, "viewing the evidence in the light most favorable to the government, ... no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Leslie,* 103 F.3d 1093, 1100 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 1713, 137 L.Ed.2d 837 (1997) (quoting *United States v. Taylor,* 92 F.3d 1313, 1333 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 771, 136 L.Ed.2d 717 (1997)).

#### B. *Rule 33*

 Both defendants also move in the alternative for a new trial pursuant to Fed. R.Crim.P. 33. Rule 33 authorizes a district court to order a new trial if one is required in the interest of justice. Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial in order to avert a perceived miscarriage of justice. *See United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992). A defendant seeking a new trial bears the burden of demonstrating the "essential unfairness of the [original] trial." *United States ex rel. Darcy v. Handy,* 351 U.S. 454, 462, 76 S.Ct. 965, 100 L.Ed. 1331 (1956). In adjudicating a Rule 33 motion, a court is entitled to weigh the evidence and, in so doing, to evaluate the credibility of witnesses. *See Sanchez,* 969 F.2d at 1413. However, a court should exercise its discretion under Rule 33 sparingly, granting a new trial only in exceptional circumstances. *See id.* 969 F.2d at 1414.

#### C. *18 U.S.C. § 371*

Defendants were convicted for violating 18 U.S.C. § 371. To establish a violation of § 371, the Government must prove beyond a reasonable doubt that two or more persons entered into the unlawful agreement charged in the Indictment, that the defendant in question knowingly and willfully became a member of the conspiracy, that one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the Indictment, and that the overt act was committed in furtherance of the conspiracy. *See United States v. Wiley,* 846 F.2d 150, 153–54 (2d Cir.1988) (Cardamone, J.); *see also United States v. Wallach,* 935 F.2d 445, 470 (2d Cir.1991). The Indictment in the instant case charged defendants with conspiring to commit (1) securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff; (2) securities fraud in violation of 15 U.S.C. §§ 77q(a) and 77x; (3) mail fraud in violation of 18 U.S.C. § 1341; and (4) wire fraud in violation of 18 U.S.C. § 1343. Put simply, the Government claimed that defendants conspired to sell worthless shares in a bogus company, Millennium.

### II. Shkolir's Motions

#### A. *Rule 29*

Shkolir moves for judgment of acquittal on the ground that the evidence adduced at trial was insufficient to prove beyond a reasonable doubt that Shkolir knowingly entered into any conspiracy. Shkolir claims that the jury should have acquitted him because the evidence equally supports the conclusions that he was a knowing conspirator and an innocent dupe. The Court rejects Shkolir's characterization of the Government's evidence and therefore denies his motion.

As the Court of Appeals for the Second Circuit has stated:

The knowledge aspect of a conspiracy charge requires that a defendant participate in the charged scheme with some knowledge of its unlawful aims and objectives. The government does not have to prove that the accused knew every objective of the conspiracy, every detail of the scheme's operation, or the identity of every conspirator.

*Wiley*, 846 F.2d at 153–54. Moreover, "[T]he jury's verdict may be based entirely on circumstantial evidence." *United States v. Martinez*, 54 F.3d 1040, 1042 (1995).

■ Drawing all reasonable inferences in the Government's favor, the Court concludes that a rational jury could have determined based on the evidence presented at trial that Shkolir knowingly entered into the conspiracy charged in the Indictment. In reaching this conclusion, the Court is mindful of the Second Circuit's instruction that, in reviewing the sufficiency of the evidence, the Court "must view pieces of evidence not in isolation but in conjunction." *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir.1992) (quoting *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir.1989)). In concluding that Shkolir knew that Millennium was a fraud, a rational jury could have looked to Shkolir's post-arrest statements, his actions in securing business addresses and a phone number for Millennium, and his presence at the December 5 meeting at Schwab with Agent McGrogan.

In an interview with FBI agents immediately following his arrest on December 8, 1997, Shkolir stated that approximately one-and-one-half months earlier, he had met an individual at a nightclub in Coney Island. The individual asked Shkolir if he wanted to go into business with the individual and make a lot of money in the stock market. The individual advised Shkolir that, after signing some papers, he would become president of Millennium. *See* Tr. 940–41. Shkolir admitted in the interview that he knew nothing about computers nor the business of Millennium, as he was a cabinetmaker by trade. *See* Tr. 940. In Shkolir's possession at the time of his arrest was a business card for "Mark's Custom Kitchen and Furniture, Inc." *See* GX 306, Tr. 936. Shkolir confirmed in his post-arrest interview that he was the president and owner of that company. *See* Tr. 940.

To lay the groundwork for the scheme, defendants opened accounts at Schwab and Republic for Millennium and procured the services of Mail Boxes Etc. and SRI. Shkolir actively participated in these activities (which, in and of themselves, are entirely legal). In so doing, Shkolir signed the Mail Boxes Etc. form indicating that he was president of a "computer consulting" firm. *See* GX 640. This shows that he was aware that Millennium was being presented to the public as a computer company and that he, a cabinetmaker who knew nothing about computers, was Millennium's president.

In the December 5 meeting at Schwab with Agent McGrogan, Shkolir sat silently next to Vainer during the following colloquy:

McGrogan: Okay. And you've developed this [millennium bug solution] Mark?

Vainer: No, not him personally, by himself. There's a team.

M: Oh, okay?

V: But he's, he's . . .

M: He's . . .

V: He's . . .

M: He's the, uh . . .

V: Yeah, he's the, he's the one that knows . . .

M: That knows . . .

V: What's going on.

M: The computer stuff?

V: Right.

GX 40. Collectively, these statements stand for the proposition that Shkolir was the individual primarily responsible for the development of Millennium's solution to the Year 2000 problem. A rational jury could have concluded that Shkolir's presence during the colloquy demonstrated that he was aware that Millennium was a fraud.

A rational jury also could have concluded that Shkolir's failure to correct the misstatement was not the result of an inability to understand English. The Government presented ample evidence that Shkolir compre-

hended English, including the testimony of both Agent McGrogan, *see* Tr. 937–39, and Special Agent Frank Godbold of the FBI, *see* Tr. 707–14, that Shkolir conversed with them in English; the forms signed by Shkolir to open the various accounts for Millennium, which were in English, *see, e.g.,* GX 640; and Shkolir's business card, which was in English. *See* GX 306. Moreover, while Shkolir argues that he was not listening to the conversation at this juncture, the jury easily could have reached the opposite conclusion based on the videotape and audiotape recordings of the meeting, as well as Agent McGrogan's testimony.

Finally, at the time of his arrest, Shkolir had in his wallet three slips of paper on which the name "Steve Wallitt" was written. Steve Wallitt testified at trial about a series of phone conversations that he had with a cold-caller pitching Millennium stock. *See* Tr. 322 (start of testimony). A rational jury clearly could have concluded that the Steve Wallitt referred to on the slips of paper in Shkolir's wallet was the same person who was solicited to invest in Millennium. This evidence thus links Shkolir to the attempts to secure outside investors in Millennium via unsolicited telephone calls.

Viewing the Government's evidence as a whole, the Court finds that a rational jury could have determined that Shkolir knew that Millennium was a fraud and that the public was being solicited to invest in this fraudulent company. The Government presented evidence showing that Shkolir knew that: (1) he was a cabinetmaker with no computer knowledge; (2) Millennium was a computer consulting company; (3) he was president of that company; (4) he was supposed to be "the one that knows what's going on" in connection with Millennium's computer-related product; and (5) outside investors had been contacted about Millennium. This evidence amply supports the jury's conclusion with regard to Shkolir's knowledge. Therefore, Shkolir's claim that the Government's evidence was insufficient is meritless, and his motion for acquittal pursuant to Rule 29 must be denied.

#### B. *Rule 33*

Shkolir moves in the alternative for a new trial pursuant to Fed.R.Crim.P. 33. Shkolir's motion for a new trial is based upon substantially the same grounds as his Rule 29 motion; he claims that the evidence at trial preponderates heavily against the verdict because the evidence allegedly does not prove that Shkolir knowingly participated in a conspiracy to defraud. The Court has concluded, *supra,* that there is competent evidence sufficient to support the jury's verdict. Shkolir does not point to any exceptional circumstances that would require a new trial in this action. Accordingly, the Court finds that a new trial is not required in the interest of justice; Shkolir's Rule 33 motion is denied.

### III. Vainer's Motions

#### A. *Rule 29*

Vainer also bases his motion for judgment of acquittal on a claim that the evidence presented at trial was insufficient to establish beyond a reasonable doubt that Vainer was guilty of criminal conspiracy in violation of § 371. Vainer claims that there was no evidence that he nor another co-conspirator made material misrepresentations about Millennium to potential investors. As the Court determines that the evidence is more than sufficient to support the guilty verdict against Vainer, it denies his Rule 29 motion.

There clearly is evidence sufficient to support the jury's conclusion that Vainer's co-conspirators made material misrepresentations to investors and that Vainer knew about these misrepresentations. Andrew Hangarter and Paul Garbaccio testified at trial that their decisions to purchase Millennium stock were influenced by the claims of cold callers that Schwab was involved in the offering. *See* Tr. 73, 494. These claims were false. Moreover, in the Millennium offering memorandum, there are material misrepresentations concerning Shkolir's educational background and professional qualifications. *See* GX 1. Collectively, these misrepresentations were designed to dupe members of the investing public into buying worthless Millennium stock.

The items in Vainer's possession at the time of his arrest provide the link upon which a rational jury could rest its conclusion that Vainer was a knowing participant in the scheme to defraud unwitting investors, including Hangarter and Garbaccio, via cold calls and the offering memorandum. At the time of his arrest, Vainer possessed: a copy of the offering memorandum that was sent to individuals who received unsolicited phone calls and expressed an interest in investing in Millennium, see GX 468; originals of certain documents contained therein, see GX 464 (Millennium's certificate of incorporation), GX 404A (accountant's letter); a script for cold calls touching on the Year 2000 problem and the benefits of buying stock in a private placement, see GX 440; a boilerplate letter confirming a purchase of Millennium stock and explaining how to remit payment, see GX 414; lists with names, addresses, and telephone numbers of prospective investors, see GX 407; ledger sheets listing purchases of shares by specific investors (including investors in Millennium), see, e.g., GX 409, 410; copies of checks deposited in Millennium's Schwab account and other checks made payable to that account, see GX 400, 401, 408; and an audiotape of Vainer monitoring Chris Giaquianto as he attempted to sell worthless stock in a different company.[1] See GX 492.

Viewing this evidence as a whole, a rational jury could conclude beyond a reasonable doubt that Vainer knew that cold callers were misleading potential investors in order to convince them to invest in Millennium, a bogus company. The evidence also tends to demonstrate that Vainer knew that potential investors received a misrepresentation-laden offering memorandum from Millennium. Vainer actively sought to reap the fruits of these misrepresentations, as demonstrated by his vigorous efforts to deposit investors' checks into Millennium's Schwab account and his inquiries about how to withdraw money from the account. Accordingly, the evidence was more than sufficient to support the jury's verdict against Vainer. Thus, his Rule 29 motion for judgment of acquittal is denied.

### B. *Rule 33*

Vainer moves in the alternative for a new trial pursuant to Fed.R.Crim.P. 33. Vainer bases his Rule 33 motion on claims that (1) the Court permitted a constructive amendment of the Indictment, and (2) the jury's verdict is suspect because of the limited duration of deliberations. As the Court concludes that neither of these theories has merit, the Court denies the motion.

### 1. *Constructive Amendment*

The Indictment in this case charged defendants with conspiracy solely in connection with the Millennium offering. Vainer argues that the Court's admission of certain evidence concerning offerings of stock in Lion Nathan Holding Corp. and Moonlight Entertainment, Inc., allowed a constructive amendment of the Indictment. The Second Circuit has explained:

> A constructive amendment occurs when the government's presentation of evidence and the district court's jury instructions combine to modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury. A constructive amendment of an indictment is a *per se* violation of the Grand Jury Clause of the Fifth Amendment that requires reversal even without a showing of prejudice to the defendant.

*United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir.1997) (internal quotations omitted); *see also United States v. Delano*, 55 F.3d 720, 729 (2d Cir.1995).

Vainer's argument in this regard is an attempt to persuade the Court to reconsider

---

1. Wallitt testified that Giaquianto identified himself to Wallitt as a cold-caller who had attempted to convince Wallitt to purchase stock in Millennium. *See* Tr. 397. In addition, on the audiotape in Vainer's possession, Giaquianto, under Vainer's direction, misled the potential buyer into believing that a major financial firm (Bear Stearns) was underwriting the offering. Giaquianto also stated that he would send the potential investor a package via Airborne Express, an overnight courier. *See* GX 492. These methods are consistent with those used to sell Millennium stock, as evidenced by the Wallitt tape, *see* GX 30, and the testimony of Hangarter, Wallitt, and Garbaccio. *See* Tr. 68, 392, 489.

its decision allowing the Government to present as background information evidence relating to Moonlight and Lion Nathan. It is well-settled that prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crime charged, and to help explain to the jury how the illegal relationship between participants in the crime developed. *See United States v. Pitre,* 960 F.2d 1112, 1119 (2d Cir.1992); *see also United States v. Langford,* 990 F.2d 65, 70 (2d Cir.1993) (Kearse, J.). In particular, evidence of other bad acts may be admitted to provide the jury with the complete story of the crime charged by demonstrating the context of certain events relevant to the charged offense. *See United States v. Inserra,* 34 F.3d 83, 89 (2d Cir.1994) (Kearse, J.).

■ The Lion Nathan and Moonlight evidence on Vainer's person at the time of arrest "completes the story" of the crime charged in the Indictment by showing the background of the charged conspiracy as well as Vainer's familiarity with the means utilized in connection with the Millennium offering. These included high pressure unsolicited phone calls, fraudulent claims of participation by well-known financial institutions, and the use of commercial couriers to exchange money and information. The tape also shows that Vainer had a relationship with a cold caller, Giaquianto, who pitched Millennium, and that Vainer was aware of Giaquianto's methods. Finally, any danger that the jury mistakenly might have convicted Vainer for having participated in a scheme to defraud in connection with Lion Nathan or Moonlight was eliminated by the Court's clear instructions to the jury prior to deliberations. In charging the jury, the Court read directly from the Indictment and in so doing explicitly instructed that the defendants were charged with participating in a scheme to defraud only in connection with the sale of stock in Millennium Software Solutions, Inc. *See* Tr. 1476–81. Therefore, there is no basis for Vainer's claim that the Court allowed the jury to broaden the basis for the conviction; defendants were convicted of violating § 371 with regard to the Millennium offering alone.

### 2. *Celerity of Jury Deliberations*

■ Vainer's argument that the jury's verdict "is inherently suspect" because of the limited duration of deliberations is wholly devoid of merit. As Vainer notes, the jury returned its verdict in approximately two hours and did not ask to see any exhibits nor have any testimony read back. However, Vainer does not cite to a single case supporting the proposition that a court should throw out a jury's verdict simply because of the speed with which it was reached. Rather, the few cases that have had to confront such an argument uniformly have rejected it. *See Veranda Beach Club v. Western Sur. Co.,* 936 F.2d 1364, 1383 (1st Cir.1991) (noting, "No matter how complicated the case, brevity in jury deliberations is not, in itself, a basis for scuttling a verdict. Courts cannot hold a stopwatch over a deliberating jury. Rather, the jury's work product must tell the tale.... [So long as the verdict is] consistent with the weight of the evidence, and no other red flags are flying, the rapidity or languor with which the jury acts is an irrelevance."); *see also Marx v. Hartford Accident & Indem. Co.,* 321 F.2d 70, 71 (5th Cir.1963) (upholding verdict where jury deliberated for only fourteen minutes); *Segars v. Atlantic Coast Line R. Co.,* 286 F.2d 767, 770 (4th Cir.1961) (jury deliberated for four minutes); *United States v. Fant,* 776 F.Supp. 257, 266 (D.S.C.1991) (ninety minutes), *rev'd on other grounds, United States v. Blanding,* 966 F.2d 1444, 1992 WL 138353 (4th Cir.1992). This Court, too, rejects the argument that the celerity with which the jury returned a verdict indicates in any way that defendants' convictions, which are supported by the evidence presented at trial, are untrustworthy. Therefore, the Court denies the motion for a new trial pursuant to Rule 33.

### CONCLUSION

For the reasons stated in this Opinion, the motions by defendants for judgment of acquittal or, in the alternative, a new trial are HEREBY DENIED.

**SO ORDERED.**